I'd like to start with just a 15-second synopsis of this case, and I'll come back to our assignments and errors. The plaintiff in this case worked in a shipping department of a small business that grows imports and distributes botanical and natural products. She must perform a variety of tasks involving quality control, packaging, and preparing a product for shipping. The products in this case are natural products that can run upwards of over 30 pounds. This case began when the plaintiff asserted a workers' compensation claim for the repetitive motion elbow injury. At that time, she was restricted in what she could lift, what she could push, what she could pull, her ability to use a taping gun, and she called it her jumper. Now at the time, she's put on temporary light duty, and it's important to emphasize that this is not an accommodation under the ADA. This is a temporary reduction of her job responsibilities, so she can get it. And what it means is that the three other employees in this small shipping department had to do some of her job for her. She fell ill for roughly 18 months before improving. When the company lands on its workers' compensation carrier, the plaintiff was unable to return to work. She was then let go because she was unable to perform the essential functions of her job. And we have a trial in this case in which a jury ultimately finds that she is unable to perform the essential functions of her job without an accommodation, and we do not challenge that finding in either of those cases. What we do challenge is that there was some accommodation out there that would have allowed the plaintiff to perform her job. And so I'd like to start with whether the child court dared and failed to direct a verdict in my client's favor on that ground. And we also have a jury instruction argument, and I'll get to that later. So whether the plaintiff could perform the essential function of her job with an accommodation goes to whether she is a, quote, qualified individual under the ADA. And there's two questions embedded in that. Let me ask you this, counsel. You said that there was an accommodation that she could have used to perform her job. Was that what you said? No, no, there was no. The jury found that she could not perform her job without an accommodation. And your basis for requesting judgment as a matter of law was? That there was no accommodation identified that would have allowed her. So there were two rulings that the jury did on her ADA claim. One was in our favor, essentially, and one was in theirs. So what was the evidence presented to the jury regarding whether or not there was no accommodation available that would allow her to perform her job? Was that evidence presented to the jury? So, you know, that goes to the heart of this appeal. It is plaintiff's burden to present evidence that she was a qualified individual, which means the plaintiff had the burden of showing some accommodation that would have allowed her to perform her job. And I targeted that there was no evidence. The evidence that was presented was hypothetical in nature. It was things like catalogs. There were questions about, well, did you think about this? Did you think about that? There was no testimony that said, if you look at the essential functions of this job, I'll tell you what those are in a second, that plaintiff could have performed those functions with some accommodation. Sitting here today, we still don't know. But you made that argument to the judge in your motion for a directed verdict. Yes, ma'am. And the judge denied your motion. The judge denied it. And so now you're telling us that we should overrule the judge's, or we should enforce the judge's ruling. Yes, ma'am. That's correct. So like I said, there are essentially two questions being vetted in the assignment of her. The first is, we have to define what are the essential functions of the job. And if you look at the testimony of Bethany New, she's the first witness in this case, she really outlines what it is a sheriff and clerk must do for this small, botanical, affiliated L&R company. And there's three tasks broadly defined. The first is called plotting. I think another way of thinking about that is quality control. The second is packaging the product. And the third is actually shooting the product. Now, where in the record can we find the description of the essential functions of the job on the testimony at trial? In the testimony of Bethany New, Your Honor. Where is that in the record? She was the first witness to testify for plaintiff. And it begins on page 103. And it goes to volume two. That's volume one of the transcript. And more precisely, is the testimony that says for the essential functions of the job, the testimony is, I can't quote it for you, but I can summarize it for you. But it's basically that there are, if you look at the formatting functions, they're located from briefs down. Correct? So I don't have the exact record sites, but they are read out in our briefs by record site. And it also goes through detail by detail what it is she has to do, and there's a record site to the testimony of Bethany New. As we go through this, I should add to that, Your Honor, Do you have a record site for this? Plaintiff confirms this in XGR 513. That would be the excerpt of record. I don't know if that's what you mean, Your Honor, but that's the transcript site. Where plaintiff says that she agrees with what Ms. New said about the functions of this job. And that's transcript page 513. Counsel, I don't mean to suggest you have to argue in a particular order. It's entirely up to you. But I want to make sure that you cover your jury instruction issue before you stop talking. Because to some extent, if the instructions are okay, then a lot of the arguments about the evidence don't really matter much. It's a jury question. Thank you, Your Honor. I will get to that in one minute. But we do believe that there really was no evidence of that combination that would allow the plaintiff to perform these functions. There's just simply no evidence in the record of this. All we see, mostly at the end of our brief, is some talk about carts. But there's so many more tasks that a shipping clerk at this shipping department must do that cannot rely on a cart. You still have to lift product. You still have to inspect it. You have to twist. You have to construct boxes. You have to take product out of the cart and put it into a box. This is alleviated in any manner by a cart. How many employees sold together with the company? There were four, I think, four who worked in shipping. Yes, there's four shippers. I think there's upwards of 50 employees total. There's a farm. There's a part of it that does importing. There's a part that grows. And there's a shipping department, which has four employees. And no suggestion was made by plaintiff that there might be an accommodation by sending her to a different department where she could perform functions there? There was some suggestion that she could perform a customer service job. I think the record shows that she tried that for a little while, but the employer didn't think that she was well-suited for that. So how many employees in that section, the customer service section? I don't have your number. So, again, I point your honors to the testimony of Bethany New. Her opening brief, which describes in detail the essential functions of this job. And I don't believe there is any accommodation, as it was described in the record, that would allow plaintiff to do this job. What we saw a lot of in the testimony was the use of the word accommodation in connection with the length of duties she was performing when she was on workers' compensation. But that is not an accommodation under the ADA. That is essentially taking some of her responsibilities and temporarily giving them to somebody else. And we know that's not permitted under the ADA. And I think the really pivotal error here is that she's asking to be excused from essential functions. She didn't provide any essential function accommodation that would allow her to perform those essential functions. A cart, you know, a motorized cart, only allows them to carry. And carrying is one small piece of what it is that she must do in this department. Let's get to the jury instructions, your honor. And my belief is that the jury instruction on what it takes to prove an ADA claim was confusing. A court combined a failure to accommodate claim with the, what we call, discouragement claim. And while maybe that, perhaps by itself, would not have been enough to reverse, embedded in that was a jury instruction that was fairly inconsistent with this court's case law, and that's what we call the, quote, unquote, triggering instruction. And the court refused to give model jury instruction 12.8. And what 12.8 has to do with is, what is the plaintiff's burden to trigger this affirmative duty to accommodate? And the courts have said unequivocally that the plaintiff must initiate the request. There is a limited exception. If the employer has awareness of the disability, has awareness that due to the disability, the employee cannot, is unable to request the accommodation, we cited three cases for that. That's Brown v. Lucky Stores. It's 246-F3D-1182. The Ziff Convention for South California Medicine Company, 302-F3D-108. And Barnett v. US Air, which I understand was reversed on other grounds, but that's where this test result comes from. It's data 3D-1105. I'll just read for those cases. They all use the exact same words. The exception to the general rule that an employee must make an initial request applies. However, only when the employer, one, knows that the employee has a disability, two, knows or has reason to know that the employee is experiencing workplace problems because of the disability,  from requesting a reasonable accommodation. Why these exceptions don't apply here? It seems like the company was on notice of the problems. I know you finally got notified by what the insurance company did was the first fall notice that she was unable to work, but there had been a period where she was on light duty. The company was certainly aware of it. You say that they tried to accommodate her by putting her in customer service for a while. Why wasn't there an actual notice that she was struggling performing the duties? Why isn't that exception applicable? The reason it's not is because that's in the context of a workers' compensation claim, and at the time, it is included and defendant, and if you look at the medical addresses themselves, this is described as a temporary injury. This is not, at this point, a disability. I would cite the court, too, in each certain case, which I think has some helpful analysis on this issue. It's called Browning v. Liberty Mutual Insurance Company, and it's cited in our brief. It's 178-3D-1043, and it talks about the analytical distinctions between a workers' compensation claim injury and a disability, and the point is the ADA is not concerned with things that are going to heal, and that's why light duty is not really an accommodation. What light duty is is a way to allow the employee to heal so that she can come back to work eventually, and so that is not notice that she is disabled. It's not notice of a need of accommodation. It is notice that she has an on-the-job injury that is temporary and is going to heal. I wouldn't have made a difference in this case because ultimately you do get notice that this is a permanent condition. Light duty can't sustain her position. You get notice of that, but you say your position is there's no accommodation we can make. There was nothing that would have helped her perform the duties in the shipping department, so I'm trying to figure out whether notice was really important or critical here. You're right. My client had notice of a disability. I agree with that, and that came from the workers' compensation insurance company, but that's not enough. There also has to be a request for accommodation, and that's what the case law says, and so if we just say all you need is notice, the quote that I just read to you from Brown versus Fletcher Storrs talks about three elements. The second one is knowledge of the disability, and so we agree that's there. There's still a third element of that test, which is if the plaintiff hasn't requested accommodation, and the employer needs to acknowledge that the employee is unable to request accommodation, and if you think about it in the context of this case, and this is why I think at a minimum it's a jury question, the plaintiff had been working with this issue for about 18 months, and so if she thought she could continue with this job, if there was a way to do it and she wanted a particular accommodation that was available to her, all the cards and scissor lifts and all the things that were in this catalog were available to her during that 18 months, she'd have to request it. I think this is not, and we're talking about the part of the ADA that puts the affirmative obligation on the plaintiff to treat people, to provide accommodation, so it's asking for the plaintiff to request it. I don't think it's a large burden for them. They just have to, they don't have to say much, but they have to say something to request it, and here there just wasn't a request. We had a period of workers' compensation, and we find out she's unable to return to work, and I think it's about a month and a half later when she's terminated. I had no prior to she requesting accommodation during that time, and so at a minimum the jury should have the right to decide whether it had been triggered in some other fashion, or if we fall under this exception in which it hadn't been triggered, in which case the jury instruction that was provided by the courts that they did not manage to support the piece of law, and that jury instruction is at DR-78 here on that one. I just wanted to ask you, I've been looking at Ms. Miller's testimony, and is there any place specifically where she has asked what are the essential functions of the job, as opposed to just describing what people do on a day-to-day basis? That appears to me a more accurate description of her testimony. I agree with that, Your Honor. She describes what it is people do at that job, but I don't recall her using as much of that question as she would do on a day-to-day basis. Let's take it that someone from HR comes in and asks what the essential functions of the job are, or there's a job description that lists the essential functions of the job, but we don't have anything like that here in this record. We do have a job description, Your Honor, and I'll get you that in your assignment. I might recall that you have it one day. Thank you. Good morning, Your Honors. I am Banach to Violet Nazary, my co-counsel, Ms. Aruna Masih, representing plaintiff Kaleemis Dunlap. I'd like to speak to the merits of the case for roughly 11 minutes and reserve four minutes for Ms. Masih to address the attorney fee issue. Nothing about us without us. This is the motto of the disability rights movement that folds folks with disabilities at the margins into the center, and this motto underlies the three issues before you today. First, specifically one on how individuals share information about the limitations that trigger the employer's duty to come to the table and engage in the interactive process. Second, the ADA's intent to preserve the dignity of individuals with disabilities to make sure that accommodations aren't hoisted on them that they don't want and that is inappropriate, and that's where we get the desired language in the law. And lastly, the way in which discrimination manifests itself, specifically under Title I in the workplace, namely disparate treatment versus failure to accommodate. I noticed that the court is interested in learning a little bit more about what type of evidence was presented to the jury to be able to establish what exactly were the essential functions of the job. The opposing counsel is represented that Ms. Dunlap agreed with Ms. Liu regarding how the job was performed. Do you take issue with that statement? What we take issue with, Your Honor, is not what physical movements were taken to perform the job, but the fact that heavy lifting is considered an essential function, whereas lifting, we agree, lifting, picking something up and moving it from point A to point B is an essential function, and it's something Ms. Dunlap can do up to a certain pound each based on her ability. Beyond that point, she required an accommodation, and we believe that when objects become heavy enough, 30 pounds, then she can rely on the mechanics of a cart, utilizing pull forces, sliding, gliding objects. That's the evidence that the jury heard. Those are the examples. Opposing counsel represented that there was never a request for accommodation. Do you disagree with that statement? We do. Where in the record can we find support for the notion that a request for accommodation was made to the employer? Ms. Dunlap realized her injury in June of 2010, but her claim for workers' comp didn't get accepted until October of 2010. But the claim for workers' comp is not a request for an accommodation, so where in the record specifically is there a request for accommodation to the employer? The trial record, page 520, where Ms. Dunlap conveys to the employer, my elbows are hurting, can I get a new chair? And she's able to find a new chair. Will you lower my desk? And her desk is lowered. And that is all before she goes in and fills out workers' comp paperwork because those two accommodations didn't alleviate her pain in her elbows. All right. So if a request for accommodation is made and those requests are complied with, what more puts the employer on notice that additional accommodation is required? Well, in this case specifically, as Ms. Dunlap is learning about her newly-minted disability, she is sharing information almost instantaneously with Liberty. She's going to a medical provider. They're talking to her about her restrictions. The next day she's giving those restrictions to her employer. So at some point, her elbow, the condition with her elbow becomes disabling over the course of the 18 months, and she consistently comes to the table and says, look, here are my doctor's notes. They tell her, look, at half your capacity, no pushing, no pulling. You will not be taping anything. You will not be making any boxes. We're going to offload. We, as Liberty, are going to decide we're going to offload the essential functions of your job to someone else. Right? And those things that she could do on her own should problem-solve ground. So, for example, it is the use of the tape gun as a form of a tape dispenser, tape gun, that aggravates her elbows. So instead of using the tape gun, Ms. Dunlap would pull pieces of tape off the tape gun and cut it with a scissor and get a piece of tape when she needed a piece of tape. She couldn't use like a chunker that seals the neck of a bag, so she would tie the bag closed. She created accommodations for herself so she could perform the essential functions of her job because she was not able to use the equipment on site. She was told, no pushing and pulling means no cards. And at trial, what we discussed with the jury was, look, there was no measurement of what kind of capacity the existing equipment provided Ms. Dunlap. For example, if pushing and pulling an existing cart went beyond her restrictions, here's an example of a cart that's motorized, right, that assists with the pushing and pulling and reduces the amount of force required. That's available on the market. This is something that we could have gotten to had we sat down at the table and engaged in the interactive process. But at the point that the employer makes a decision, Liberty makes a decision, look, we know everything there is to know about your disability. We got all your medical notes. We got your IME, everything. And we've decided, the letter on April 26th says, we've decided that you can't do the job. You're fired. That is in violation of the interactive process, despite the fact that their duty was triggered because they had intimate details and documentation of Ms. Dunlap's changing restrictions over time, over the course of the 18 months. Counsel, can we discuss the jury instructions, please? Absolutely. Do you disagree that the instructions conflated the disparate treatment and failure to accommodate theories? Yes, I believe, and as plaintiff argued vehemently at trial, at the pretrial conference during trial as we're drafting jury instructions, that the failure to accommodate claim and the disparate treatment claim are stand-alone claims. They absolutely are. We have case law that says that. Did the instructions treat them as stand-alone claims? Not the final jury instructions did not. In fact, Judge Simon, our trial court judge, was very insistent on relying on Ninth Circuit President, Sam Peer. And in the Sam Peer case, he read the language directly. He said, when you have a failure to accommodate claim, the prima facie case requires one, two, three, and those three elements are in our jury instructions. Right, but if they're both stand-alone claims, why isn't it that there is any? Well, Judge Simon, when he read the case law, Sam Peer standing on Allen, standing on Nunez, he could not decipher where the distinction in the elements occurred. He saw the same three elements articulated for both types of claims. And he relied on the Ninth Circuit analysis. In fact, he told us time and time again, counsel, if you disagree with me, take it up with the Ninth Circuit Court. So that's why we're here. We have to decide whether or not he was correct in combining those two theories into one instruction. And so what case are you relying on? Are you relying on the same case authority that he relied upon? We are. And what's the language? Which case was that? Sam Peer. And if you give me a minute, I will try to get you an exact citation. Can I get you that citation in the form of a letter? No, if you don't have it now. If I don't have it now. Okay. It's okay to argue at home. Okay. Well, if my memory serves correct, there's language in Sam Peer that says to prove the prima facie case, you must, kind of must prove one, two, three, and those three elements are. But for both those theories? Correct. For both those theories? For failure to accommodate. Yeah. Yeah. But why did you translate that into the disparate impact theories? I don't understand why that would mean that both those theories could be covered in the same instruction. I guess I'm not getting your argument. I think what happened here is that because the disparate treatment evidence is so clear on its face. We have the April 26th letter that says, Ms. Dunlap, you are fired because of your disability, right? The nexus element. Because that's so clear on its face, it may be that Jeff Simon felt comfortable that conflating the two claims wouldn't actually take away or cause any error. Because Liberty did not object or try to step away from the fact that they made a decision solely based on Ms. Dunlap's disability, that that was a given. But did Liberty object to the instruction? One more time. Did Liberty object to the instruction? Initially when Liberty proposed jury instructions, they collapsed the claims. Plaintiff came forward and articulated the distinction. Liberty agreed in the form of a letter to the judge. Jeff Simon was very clear, in order to preserve, you must file. Liberty did not file their objection until the day after the jury rendered its verdict on August 1. But throughout the case, and if you look at the transcript, it is a conversation between Jeff Simon and Carrie Smith, the plaintiff's attorney, back and forth on the conflation of the claims. Was there a special or a general verdict in court yesterday? We had a conversation about that somewhere in between. In the sense that there was some crafting in the way that the questions were asked, but it was pretty general. The verdict forms had distinguished between the two claims? No, it did not. But as far as legal error, the question is, would it have really made a difference? Oh, I'm looking at my time frame. The question is, would it have made a difference? And given the slam-dunk evidence that we had on disparate impact, I think the jury would have come out as seeing whether the two claims were or not together. If I may hand over my time. Thank you. Good morning. Good morning. Eruna Massey, on behalf of the plaintiff, Tracy Dunlap, I'm going to address the attorney fee appeal that we filed with regard to Judge Simon's 50% across the board reduction of their request for attorney fees. And what our appeal requires this court to do is to apply the Ensley two-factor test regarding whether or not, first of all, her claims on which she was successful and those on which she was unsuccessful are related. And then secondly, whether or not the overall success was such that all of the hours expended on the case are deemed reasonable. And it is the plaintiff's position that on both of those questions, the district court erred in applying the law as well as in its findings, which we do not believe are supported by logical, plausible or with substantial record in the substantial evidence in the record. So on the relatedness question, this court has said that you need to look to whether or not there's a common core of facts. And you need to look to, according to Hensley, whether or not there are related legal theories. And in addition, under Harrington, the court has said you need to look to whether or not work on the claims on which you were unsuccessful nevertheless assisted on the overall success of the case. And in this particular case, the record's very clear. All of the claims arose out of a common core of facts. They all arise out of the employment relationship. They also all arise out of Liberty's duty as an employer. They also all revolve around the extent of her physical limitations, following the closure of her worker's comp claim, and whether or not she had the ability to perform the essential functions of the job with or without accommodation at that particular stage. They're also all designed to remedy the same conduct, which is to have your employer provide you with the ability to continue to work with or without accommodation. Finally, even the whistleblower claims was a claim which required her to prove that her report's Boolean EEOC was made in good faith, was supported by the law. And, in fact, Liberty raised an affirmative defense that it would have, regardless, taken the same action based on her physical limitations. So at the end of the day, you had six claims that were based on a common core of facts, were designed to remedy the same injury, and work on all of the claims resulted in the success that was achieved on the disability claims. The extent of the success issue, the district court really employed the mechanical type approach that both the Supreme Court and this court have rejected and said you cannot do this mechanistic kind of approach where you do a ratio of successful and unsuccessful cases. The cases that Liberty has relied upon in which the court made certain kinds of reductions were distinguishable from this case. For example, they cite the Harris case for a 50% reduction. In that case, you had a situation in which the plaintiff sought $5 million and ended up with a recovery of only $25,000. That's a completely different set of facts than you have in this particular case. In addition, we really believe that the case of Rivera, which arose out of this circuit when I was in the United States Supreme Court, shows why when you have related claims, and they all contribute to the success, even if the success is the attorney fees are seven times the amount awarded by the jury, nevertheless that a full award of attorney fees is appropriate, like the Rivera plaintiffs, Ms. Dunlap was not extravagant in her request for fees. Her case promoted not just her own personal interests, but those of the others employed by Liberty. And in Gonzalez, this court has recognized that in civil rights cases, the amount recovered for a client is not the only measure of the success of the case because the win actually promotes larger societal benefit. Thank you, Counselor. You've exceeded your time. I'll give you a minute for rebuttal on the attorney's case portion. Counsel? Thank you, Your Honor. I took very little time to the attorney fee than what was my brief. It's a statutory call by the court. If you look at the claims, there were a number of claims. There was limited success. If the court was generous in saying they succeeded in half of their claims, they received about half of their damages. And so the court excessed discretion and I think applied the appropriate factors in doing so. All right. Thank you. Here's my brief for rebuttal. Was there any final comment you want to make? No. Thank you. Thank you both, Counsel. If it's just argued, be it submitted for decision by the court.
judges: Gould, Rawlinson, Burns